29332. ATLANTA & WEST POINT RAILROAD COMPANY
*v.* HEMMINGS.

DECIDED MARCH 14, 1942. ADHERED TO ON REHEARING, APRIL 3, 1942.

*Heyman & Heyman, Stanford Arnold,* for plaintiff in error.
*Stonewall H. Dyer, A. H. Freeman,* contra.

BROYLES, C. J. C. R. Hemmings (hereinafter referred to as the plaintiff) sued the defendant railroad company (hereinafter called the defendant) for damages alleged to have been caused by the infliction of personal injuries upon him and injury to his automobile

in a collision, on a private railroad crossing, between a train of the defendant and the plaintiff's truck driven by him. The demurrers, general and special, to the amended petition were overruled, and exceptions were taken to that ruling. A verdict in favor of the plaintiff for $3000 was returned, the defendant's motion for a new trial was overruled, and that judgment was assigned as error.

■ Certain paragraphs of the general demurrer attacked paragraphs 6(3) and 6(5) of the petition, and alleged that to charge the defendant with negligence, as alleged in those paragraphs, "would be to impose upon this defendant a duty which would constitute an undue burden on interstate commerce and would be in violation of paragraph 3 of section 8 of article 1 of the constitution of the United States, said paragraph providing among the powers of Congress the power to regulate commerce with foreign nations and among the several States and with the Indian tribes." The defendant also raised the same question in its answer, and alleged therein and in its bill of exceptions "that the decisions of the Supreme Court of this State, to the effect that it is for a jury to determine whether or not it is negligence on the part of the engineer of a railroad company to fail to reduce the speed of a train so as to prevent injury to persons or property that may happen to be on a crossing, whether a public or a private crossing, where the presence of the persons or property is to be anticipated, are unconstitutional, imposing an undue burden on and an unreasonable regulation of interstate commerce in violation" of the above-cited paragraph of the constitution of the United States. This case was transmitted to the Supreme Court and transferred by that court to this court, the Supreme Court holding that no constitutional question was presented, and that a decision by it was not "a law of the State" within the meaning of the above-cited constitutional provision. *Atlanta & West Point R. Co.* v. *Hemmings,* 192 *Ga.* 724 (16 S. E. 2d, 537). In view of that decision and the decision of this court in *Seaboard Air-Line Ry. Co.* v. *Benton,* 43 *Ga. App.* 495 (5) (159 S. E. 717), we hold that those paragraphs of the general demurrer attempting to raise the above-stated constitutional question were properly overruled. The overruling of the other paragraphs of the general demurrer and of the special demurrers was not error.

■ Special ground 5 of the motion for new·trial complains of

the admission in evidence, over the defendant's objection, of Carlisle mortality and annuity tables as contained in the 70th Georgia Report, the objection being that no evidence had been introduced showing any permanent impairment of the plaintiff's condition or that his injuries would permanently impair his earning capacity. And special grounds 9 to 12 inclusive complain of certain excerpts from the charge relating to the alleged permanent impairment of the plaintiff's earning capacity. "In a suit for damages on account of personal injuries resulting from a tort, where the petition alleges that the ability of the plaintiff to earn money has been decreased, it is error for the judge to charge the jury on this element of damages, unless there is some evidence upon which the jury can base with reasonable certainty a finding as to the amount of such damages" (*City of Atlanta* v. *Feeney,* 42 *Ga. App.* 135 (3), 155 S. E. 370), but where the plaintiff testifies as to his age, his occupation, his condition of health before and after his injury, his earning capacity when injured and afterwards, sufficient data are given to enable the jury to determine how long he will probably live and labor, and how much the pecuniary value of his life has been diminished by his injury. *Southern Ry. Co.* v. *Petway,* 7 *Ga. App.* 659 (2) (67 S. E. 886). In *Macon Railway & Light Co.* v. *Streyer,* 123 *Ga.* 279 (3) (51 S. E. 342), where the plaintiff's injuries were inflicted about a year before the trial of the case, and where her sufferings had continued unabated up to the date of the trial, the court said: "The jury were authorized to infer that the plaintiff's injuries would be permanent, from the character of her suffering, and the length of time that it had continued up to the date of the trial; and hence it was not error to charge on the subject of permanent injuries. This is so though there was no direct and positive evidence that her injuries were in fact of a permanent character." To the same effect see *Southern Ry. Co.* v. *Petway,* supra, headnote 1.

In the instant case, the plaintiff was injured about five months before the trial, and, in respect to his injuries, he testified substantially as follows: "While jumping from my automobile on a railroad crossing I was struck in my back, right over my kidneys, by some part of the engine and knocked unconscious. I was carried in an ambulance to the hospital where I stayed about two weeks. My physician, Dr. McDonald, advised me to stay there longer, but

I wanted to go home and was removed there where I stayed in bed thirty-seven days. My back and my kidney were injured. I have suffered bad ever since this happened. When I urinate, my water is nearly pure blood. It is still that way. When I urinate I pass pus and blood from my kidneys. My back was kept strapped and bandaged about sixty-five days. I still have to take medicines to ease my pains, and have to get up three or four times a night to ease my kidneys. When I lie on my back in bed I suffer. My back hurts so that nearly every night I have to get out of bed and stay up an hour or two. My suffering makes me nervous. I can't even hold a cup of coffee. My doctor is still treating me. Before the engine hit me I was in good health, with the exception of my hands which were crippled, and I worked every day. My business was buying and selling cattle. I paid cash for what I bought and sold for cash and didn't keep any books. I estimate that I averaged $10 gross a day for six days a week. Out of that amount I had to pay the expense of operating and repairing my truck and other incidentals. As a result of these injuries my earning capacity has been diminished two thirds, if not totally, because I can't drive a truck further than from my house to town, and I have to rest half a day then. Since this injury I have not been able to do any work and haven't made a penny. I am thirty-five years old."

Dr. McDonald testified that he had treated the plaintiff for his injuries while confined in the hospital and afterwards, and corroborated the plaintiff's testimony about the pus and blood in the plaintiff's urine. The doctor testified: "Of course, the exact locality or region that this blood came from I can't state, but the supposition is that it came from the kidney. I taped his back with adhesive tape on a number of occasions." The doctor further testified in substance as follows: "When I first examined the plaintiff, he had a bruise on his left shoulder and also over the small of his back on the left side—the left side of the spine—between the ribs and the hipbone. There was some swelling there and the bruise was red. It indicated that some object had struck him there. I prescribed for him while he was at the hospital and afterwards. He complained of headaches and about his back hurting and I gave him medicines to relieve his pains. About two weeks ago he was complaining of headache and nausea and I gave him codine. I knew the plaintiff before he was injured, and he

was then in good physical condition, so far as I know. He was able to carry on his business as a cattle trader, so far as I know. Apparently he is not in as good condition now as he was before his injuries. · He goes around on crutches, and is not able to work like he did before. As to what extent his earning capacity is diminished at the present time as the result of his injuries, I don't know exactly how to estimate. When I first examined him, the x-rays failed to show any bone injury, but x-rays won't show up a kidney or anything in it. If he had an injury of that kind it wouldn't show. The fact that he passed blood from his bladder shortly after his injury would indicate that there might have been a concussion or laceration of the kidney." The witness then testified that from the indications he saw when he first began treating the plaintiff, his "prognosis of the case was that he would get well in anywhere from a few weeks to a few months." The witness did not testify whether he had subsequently changed his prognosis or still adhered to it. However, conceding that the witness's testimony should be construed as meaning that in his opinion the plaintiff's injuries were not permanent, the jury were not obligated to accept that opinionative evidence as true. While they could have so accepted it, and have found from it and other evidence that the plaintiff's injuries were not permanent and that his earning capacity had not been permanently diminished, this court can not hold as a matter of law that, under the plaintiff's testimony and other evidence in the case, the jury were not authorized to find to the contrary. It is well-settled law that opinionative evidence is not binding upon a jury, but in their discretion can be accepted or rejected. The admission in evidence of the mortality and annuity tables was not error, nor was it error for the court to submit to the jury the determination of the question whether under the evidence the plaintiff's injuries had permanently impaired his capacity to earn money.

■ A special ground of the motion for new trial assigns as error the following excerpt from the charge of the court: "I charge you that when a number of persons habitually, with the knowledge of the railroad company and without its disapproval, use a private passageway for the purpose of crossing the tracks of the railroad company at a given point, the employees of the company in charge of one of its trains who are aware of the custom are bound upon a given occasion to anticipate that persons may be upon the tracks

at this point and are under the duty to take such precautions as to prevent injury to such persons." The charge is complained of because it imposed "the absolute duty on the defendant to take such precautions as would prevent injury to persons who might be on the crossing as the defendant's train approached said crossing." Apparently the court was endeavoring to charge the language of the Supreme Court in *Bullard* v. *Southern Ry. Co.*, 116 *Ga.* 644 (43 S. E. 39), and in *W. & A. R. Co.* v. *Michael*, 175 *Ga.* 1 (6) (165 S. E. 37), and the language of this court in *Wise* v. *Atlanta & West Point R. Co.*, 61 *Ga. App.* 372 (6 S. E. 2d, 135). However, in each of those cases the language employed was that, under the stated circumstances, the employees of the company in charge of its train "are under a duty to take such precautions to prevent injury to such persons *as would meet the requirements of ordinary care and diligence.*" (Italics ours.) In our opinion the charge as given in the instant case imposed an absolute duty upon the defendant to take such precautions as would prevent injury to persons who might be on the railroad crossing, and therefore was reversible error. This is true although the court had previously charged that the duty of said employees of the defendant in approaching the crossing was to exercise ordinary care and diligence. After the erroneous charge was given the court did not repeat its instruction that the duty of the employees of the defendant in approaching the crossing was to exercise ordinary care and diligence. So that the last instruction on this vital subject given to the jury was the erroneous one; and, since the evidence relied upon to establish the defendant's liability was exceedingly weak, this court can not hold that the charge was harmless. "Where an erroneous charge on a material issue is of such a nature as is calculated to confuse or mislead the jury, a new trial will be granted, notwithstanding the correct rule may have been announced in another portion of the charge. *W. & A. R. Co.* v. *Clark*, 117 *Ga.* 548 (44 S. E. 1)." *Tietjen* v. *Meldrim*, 169 *Ga.* 678, 696 (151 S. E. 349); *Kelly* v. *Locke*, 186 *Ga.* 620, 627 (198 S. E. 754); *Central of Ga. Ry. Co.* v. *Deas*, 22 *Ga. App.* 425 (3) (96 S. E. 267); *Southern Grocery Stores* v. *Cain*, 50 *Ga. App.* 629 (2) (179 S. E. 128). In the *Cain* case, headnote 2 reads as follows: "The duty which rests upon the occupant of premises as respects persons lawfully coming upon the premises is to exercise ordinary care to keep the premises

safe. Upon the trial of a suit for damages by a customer against the occupant of premises, to recover for personal injuries alleged to have been received by the plaintiff while in the store, a charge of the court that if the jury should believe that at the time the plaintiff was injured the floor was not in a reasonably safe condition for a person entering the store, and that the plaintiff entered the store and was injured, the plaintiff would be entitled to recover, if not barred by the plaintiff's failure to exercise ordinary care, is subject to the objection that it eliminated from the consideration of the jury any question as to the defendant's negligence as respects the maintenance of the condition of the floor. Since the evidence presented the issue of fact whether the defendant was negligent, the charge was error harmful to the defendant. The mere fact that the court elsewhere in the charge instructed the jury that the duty which rested upon the defendant was to exercise ordinary care to keep the premises safe does not cure the error in the charge excepted to. *Morrison* v. *Dickey,* 119 *Ga.* 698 (2) (46 S. E. 863); *Gill* v. *Willingham,* 156 *Ga.* 728 (4) (120 S. E. 108); *LaGrange Ice &c. Co.* v. *McManamy,* 32 *Ga. App.* 195 (122 S. E. 708)."

The other special assignments of error are without merit; and the general grounds of the motion for new trial are not now passed upon. *Judgment reversed. MacIntyre and Gardner, JJ., concur.*

### ON REHEARING.

BROYLES, C. J. A rehearing of this case was granted solely on the following ruling of this court: "The other special assignments of error are without merit." There were twelve special grounds of the motion for new trial, and grounds 1, 2, 3, 4, 5, 8, 9, 10, 11, and 12 had been passed upon directly or in effect before the above-quoted ruling was made. Therefore, said ruling was made in reference to special grounds 6 and 7.

The defendant in its answer set forth the following allegations: "5. Further answering said petition, defendant shows that the allegations of negligence charged by petitioner against defendant are the following: (a) Driving said train at said time and place at 60 miles per hour. (b) Failing to exercise ordinary care to anticipate the presence of the petitioner at said crossing, and in the operation of said train in a way to avoid injuring petitioner as he entered upon the said crossing. (c) In driving the said train at said time and place at 60 miles per hour in violation of defendant's

duty to petitioner to exercise ordinary care in approaching the said crossing to avoid injuring petitioner. Defendant says that the Court of Appeals of Georgia and the Supreme Court of Georgia have ruled it to be the law in Georgia that whether or not it is negligence on the part of the engineer of a railroad company to fail to reduce the speed of trains so as to be able to prevent injury to persons who might be on a private crossing or pathway is a matter to be left for determination by a jury. Defendant shows that the Court of Appeals of Georgia and the Supreme Court of Georgia have likewise ruled that whether or not an engineer, in approaching a public crossing where people are to be anticipated, should so reduce the speed of his train as to avoid doing injury to a person on the crossing is a matter to be determined by a jury. Defendant shows, therefore, that according to said rulings . . there is no difference in degree as to the duty of the defendant's engineer whether he is approaching public crossings, a private vehicular crossing, or a private pedestrian crossing. Defendant shows that in order to avoid the responsibility of injury to persons on crossings under said alleged principles of law announced to be applicable by the appellate courts in this State the locomotive engineer of a train must so reduce the speed of his train in approaching crossings as to be able to stop said train should any person be upon said crossing.

"6. Defendant . . operates a railroad extending from West Point, Georgia, to Atlanta, Georgia. Its passenger trains operate into the Atlanta Terminal Station in Atlanta, Georgia. Its freight trains operate over a belt line to a point known as Hulsey Station. The length of defendant's railroad from West Point, Georgia, to Atlanta Terminal Station is approximately 86 miles. The length of the Atlanta and West Point Railroad from West Point, Georgia, over its belt line, to Hulsey Station is approximately 90 miles. Defendant shows that between West Point, Georgia, and the Atlanta Terminal Station in Atlanta, Georgia, defendant's passenger trains operate over 105 public road crossings. Between West Point, Georgia, and Hulsey Station, defendant's freight trains operate over 96 public crossings. Between West Point, Georgia, and the Atlanta Terminal Station, defendant's passenger trains operate over 57 private vehicular crossings, that is, crossings that may be used either by vehicles, including automobiles, trucks, etc.,

and pedestrians. Between West Point, Georgia, and Hulsey Station, defendant's freight trains operate over 58 private vehicular crossings. Between West Point, Georgia, and the Atlanta Terminal Station, defendant's passenger trains operate over 196 private pedestrian crossings. Between West Point, Georgia, and Hulsey Station in Atlanta, Georgia, defendant's freight trains operate over 184 pedestrian crossings. Defendant shows that the principle of law above set forth as to the duty of an engineer operating a railroad locomotive applies to public crossings, private vehicular crossings, and private pedestrian crossings.

"7. For further answer defendant shows that in order for a train to be prepared to stop at any crossing the speed of such train must be reduced to not more than 5 or 6 miles per hour when it is within 50 to 100 feet of said crossing. Defendant shows that with the exception of three miles in Troup County, Georgia, between mile posts 77 and 74, there is no point on the line of its railroad where there are not crossings over its tracks within each specific mile of said railroad. Defendant shows that for it to comply with said rule of law . . would not only cause it to lose the time that would be consumed in reducing speed in approaching said crossings and the time that would be consumed in attaining reasonable speed for the operation of its trains after passing such crossings, but said crossings are so numerous and so spaced over the line of defendant's railroad that defendant's trains could never attain a speed greater than 8 or 10 miles per hour and its average speed would be reduced to 6 or 7 miles per hour.

"8. Defendant shows that the maximum speed in the present actual operation of its passenger-trains is 65 miles per hour, and that with such maximum speed its minimum schedule from Atlanta to West Point, Georgia, and from West Point . . to Atlanta, where its trains make stops only at LaGrange, Hogansville, Grantville, Newnan, Palmetto, Fairburn, and Atlanta, requires from two hours and twenty minutes to two hours and thirty minutes. Defendant shows that to comply with said principle of law above set forth would compel its passenger trains to operate at such a reduced speed as to extend such schedule from two hours and twenty minutes to a minimum of ten hours.

"9. Defendant shows that its freight trains now operate at a maximum speed of 45 miles per hour and that at such maximum

speed it requires from four to four and one-half hours for defendant's freight trains to operate between Atlanta and West Point, Georgia. Defendant shows that to comply with the principle of law hereinabove set forth would require such a reduction in the speed of freight trains as that it could not operate its freight trains between Atlanta and West Point within less than twelve to fourteen hours.

"10. Defendant says that for a passenger train, after having come to a stop or reduced its speed to 6 miles per hour, to attain its maximum speed would require a distance of one mile. Defendant says that for the average freight train, after having come to a stop or reduced its speed to 6 miles per hour, to reattain its maximum speed would require a distance of not less than one and one-half miles.

"11. Defendant shows that on account of the numerous crossings on the line of defendant's railroad none of its trains could ever obtain the maximum speed.

"12. Defendant further shows that none of said crossings present conditions making said crossings peculiarly dangerous.

"13. Defendant further shows that the crossing at which petitioner claims to have been injured was not peculiarly dangerous, nor did any condition exist that would require said crossing to be treated differently from the various other crossings on the line of the defendant's railroad. Defendant says that while said train approaches said crossing in a cut that the approach from the south has a straight track for several hundred feet; that the width of the railroad bed between the banks of said cut is such that a person operating a truck or automobile can bring the same to a complete stop in a safe position relatively to said track and the operation of trains thereover, and see an approaching train for a distance of 500 feet or more.

"14. Defendant shows that it is engaged in interstate commerce, and all of its trains, whether freight or passenger, are operated in interstate commerce.

"15. Defendant shows that the train that is charged to have collided with the truck of petitioner and to have caused his injury and damage to his truck was a passenger train, and that said passenger train, at the time of said alleged occurrence, was being operated in interstate commerce. Defendant says that said passenger

train was what is known as a through passenger train, hauling several Pullman cars besides day coaches, mail coaches, and express coaches; that said train was hauling passengers traveling from without the State of Georgia into the State of Georgia and was similarly handling mail, baggage and express from without the State of Georgia into the State of Georgia.

"16. Defendant says that to have required said train to be operated in accordance with the legal principles above set forth would have increased the length of time of operating said train from West Point, Georgia, to Atlanta, Georgia, not less than seven and one-half hours in addition to the time ordinarily consumed in the schedule for the operation of said train.

"17. Defendant shows that said law, as announced by the Supreme Court and the Court of Appeals of Georgia and as stated to be the law of Georgia and binding upon this defendant . . in the operation of its trains, and particularly in the operation of the above-described passenger train, constitutes an unreasonable regulation of interstate commerce and is a violation of paragraph 3 of section 8 of article 1 of the constitution of the United States, said paragraph providing among the powers of Congress the power to regulate commerce with foreign nations and among the several States and with the Indian Tribes.

"18. The defendant, therefore, shows that said principles of law, so announced by the Supreme Court of Georgia and by the Court of Appeals of Georgia, and sought to be applied as against defendant in said case, being violative of paragraph 3 of section 8 of article 1 of the constitution of the United States, is void, without force and effect, and not applicable to this defendant in the operation of said train and that this defendant is not, and was not, guilty of any negligence as so alleged creating liability on the part of this defendant to said petitioner."

None of the above-quoted paragraphs of the answer was demurred to. Special ground 6 of the motion for new trial alleges that on the trial the defendant had present three witnesses, T. W. Graft, S. B. Bullington, and H. R. Butler, whose testimony would have supported the allegations of fact set out in paragraphs 5 to 18, inclusive, of the answer, and that the court was so informed. The ground sets forth in great detail the facts alleged in said paragraphs of the answer, and alleges that the court was informed that the

three witnesses would testify in support of those facts and, in the absence of the jury, counsel for the defendant detailed to the court the facts which he expected to establish by their testimony, such facts supporting said paragraphs of the answer. The court refused to allow said witnesses to so testify, and the ground assigns that ruling as error.

In Seaboard Air-Line Ry. *v.* Blackwell, 244 U. S. 310 (37 Sup. Ct. 640, 61 L. ed. 1160), where the decision of this court was reversed (16 *Ga. App.* 504), the headnote reads as follows: "That provision of the 'blow-post' law of Georgia (Civil Code, 1910, §§ 2675-2677), which requires railroad companies to check the speed of trains before public road crossings so that trains may be stopped in time should any person or thing be crossing the track there, is a direct and unconstitutional interference with interstate commerce as applied to the state of facts specifically pleaded by the defendant interstate carrier in this case, whereby it appears that, to comply with the requirements, the interstate train in question would have been obliged to come practically to a stop at each of 124 ordinary grade crossings within a distance of 123 miles in Georgia extending from Atlanta to the South Carolina line, and that more than six hours would thus have been added to the schedule of time of four hours and thirty minutes. Southern Railway Co. *v.* King, 217 U. S. 524 [30 Sup. Ct. 594, 54 L. ed. 868], distinguished." In the Blackwell case the railroad set up in its answer substantially the same allegations of fact that are set up in paragraphs 5 to 18 inclusive of the answer in this case, and in the Blackwell case the judgment of this court affirming the ruling of the trial court sustaining the demurrer to the answer was reversed by the Supreme Court of the United States. In our opinion the ruling in the Blackwell case (the question here involved being a Federal one) is controlling on this phase of the instant case, and the court erred in rejecting the proffered evidence set forth in special ground 6 of the motion for new trial. It is true that in the Blackwell case the duty on the railroad was imposed by a statute of this State, while the duty in this case was imposed by certain unanimous decisions of the Supreme Court of Georgia and the Court of Appeals of Georgia. However, in our opinion, the burden imposed by such decisions upon interstate railroad carriers, which seriously interferes with interstate commerce. is as substantial and hurtful as if the

burden were imposed by a statute, and we so hold.

In *Western Union Telegraph Co.* v. *King,* 61 *Ga. App.* 537, 538 (6 S. E. 2d, 368), this court, in dealing with an interstate tele-graph message and applying a Federal rule instead of the Georgia rule as to the allowance of nominal damages, said: "The award of damages by way of a different *rule* as to nominal damages would be just as objectionable and create or tend to create as much lack of uniformity in the regulation of interstate commerce as *a statute* which had a like effect." (Italics ours.) The decision of this court in *Seaboard Air-Line Ry. Co.* v. *Benton,* 43 *Ga. App.* 495 (159 S. E. 717), heretofore cited in our ruling sustaining the over-ruling of the demurrer to the petition, is not applicable to this phase of the instant case, since the railroad crossing in question in that case was "a public crossing in a populous community" where the traffic was very heavy, thereby making the crossing a dangerous one. Furthermore, the record in that case shows that the defend-ant railroad was permitted *to introduce evidence in support of its plea* that to subject it to damages on account of alleged negligence in failing to check the speed of its train on approaching the public crossing at which the homicide occurred would, *in view of the time that would be thus consumed at numerous crossings, amount to an unauthorized regulation of interstate commerce, in that it would impose an unreasonable burden thereon,* thus violating the com-merce clause of the Federal constitution. It further appears from an examination of the record in the *Benton* case that the evidence introduced by the railroad to support its plea failed to meet the requirements of the law as laid down in the Blackwell case, supra. Our present ruling is not contrary to our previous holding that the demurrer to the petition was properly overruled. The facts set forth in the plea were matters of defense and could not properly be injected into the demurrer.

Special ground 7 complains of the following charge: "I charge you that one of the issues made by the pleadings and the evidence in this case is whether the failure of the engineer in charge of the defendant's train, if he did so fail, to give any warning of the ap-proach of the train and have it under control when approaching the crossing described in plaintiff's petition amounted to a lack of ordinary care under the circumstances of this case. In your con-sideration of the question whether the agents and employees of the

defendant company, at the time and place alleged in this petition, exercised ordinary care in approaching said private crossing, you would consider the speed of the train, as shown by the evidence; you would consider the length of time that said crossing had been in existence and the use of same by persons residing in said community, as shown by the evidence; whether this crossing was used with the consent of the defendant company and maintained by it; whether the use of the crossing, as shown by the evidence in the case, was such as would make the servants of the defendant company anticipate the presence of persons on this crossing; and whether it was used frequently or infrequently by the people in that community." The ground contends "that so much of said charge as related to the question of the engineer having said train under control when approaching said crossing, and in authorizing the jury to consider the speed of the train in approaching said crossing, was error in that it imposed upon said defendant a duty not imposed by law, and further in that to submit to the jury the requirement that the engineer have the train under control was submitting to the jury a principle of law that constituted an undue burden on, and an unreasonable regulation of, interstate commerce in violation of paragraph 3 of section 8 of article 1 of the constitution of the United States." In the above-quoted charge, the jury were not instructed, either literally or substantially, that it was the duty of the defendant's engineer in approaching the crossing in question to operate the train at such a speed and to have it under such control that he could stop it before it reached the crossing in the event that any person should be thereon. In our opinion, the charge is not fairly subject to any of the exceptions set forth in the ground.

The statement in our original opinion that "the other special assignments of error are without merit" is withdrawn, and the present opinion is substituted therefor.

*Judgment, as so modified, adhered to. Gardner, J., concurs in the result, under the facts of this case.*

MacINTYRE, J., dissenting. I think there is a marked difference between the statutory enactment known as the blow-post law (Code of 1910, §§ 2675-2677), which was held by the Supreme Court of the United States, in Seaboard Air-Line Ry. *v.* Blackwell, 244 U. S. 310 (supra), to be "a direct and unconstitutional inter-

ference with interstate commerce," and the "rule" laid down by the unanimous decisions of the Supreme Court of Georgia "that whether or not it is negligence on the part of the engineer of a railroad company to fail to reduce the speed of trains so as to be able to prevent injury to persons who might be on a . . crossing *is a matter to be left for determination by a jury*" (par. 6 of the defendant's answer) ; and I am of the opinion that the ruling in the Blackwell case is not controlling here. But, in any event, I think that this court is bound by the unanimous decisions of the Supreme Court of Georgia, referred to in the defendant's answer and in the majority opinion of this court, and that paragraphs 5 to 18, inclusive, of the answer set out no valid defense to the plaintiff's cause of action. Of course, if I am correct in the conclusion that said paragraphs constitute no defense to the action, it was not error for the judge to reject evidence offered to support the averments of those paragraphs. *Kelly* v. *Strouse,* 116 *Ga.* 872 (2 *a*) (43 S. E. 280) ; *Hill* v. *Williams,* 31 *Ga. App.* 72 (2) (119 S. E. 468). Moreover, since the rendition of the decision in Erie R. Co. *v.* Tompkins, 304 U. S. 64 (58 Sup. Ct. 817, 82 L. ed. 1188), in which Swift *v.* Tyson, 16 Pet. 1 (10 L. ed. 865), was overruled, the Supreme Court of the United States has been more liberal in adopting and applying the rules of law laid down by the Supreme Courts of the respective States to causes tried therein, and the court, in the Tompkins case, supra, said that "Except in matters governed by the Federal constitution or by Acts of Congress, the law to be applied in any case is the law of the State." See also Pokora *v.* Wabash Ry. Co., 290 U. S. 624 (54 Sup. Ct. 346, 78 L. ed. 544, 91 A. L. R. 1049, 1055, notes) ; *Georgia Railroad & Banking Co.* v. *Stanley,* 38 *Ga. App.* 773 (145 S. E. 530) ; *Seaboard Air-Line Ry. Co.* v. *Sarman,* 38 *Ga. App.* 637 (144 S. E. 810).